# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ARWA CHIROPRACTIC, P.C., an Illinois professional corporation, individually and as the representative of a class of similarly situated persons, <br><br> Plaintiff, <br><br> v. <br><br> MED-CARE DIABETIC & MEDICAL SUPPLIES, INC. and STEVEN SILVERMAN, <br><br> Defendants. | 14 C 5602 <br><br> Judge John Z. Lee |

## MEMORANDUM OPINION AND ORDER

Plaintiff Arwa Chiropractic, P.C. ("Arwa") brought this action against Defendants Med-Care Diabetic & Medical Supplies, Inc. ("Med-Care") and its CEO, Steven Silverman, arising out of a series of six faxes that Med-Care sent to Arwa between July and October 2013. Arwa brings claims under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. § 505/1 *et seq*, as well as a common-law claim of conversion. Arwa has moved for partial summary judgment as to its TCPA claim, and Silverman has moved for summary judgment on all claims. For the reasons stated herein, Silverman's motion [129] is granted, and Arwa's motion [132] is denied.

# Factual Background[1]

Arwa is an Illinois medical provider based in DuPage County, Illinois. Pl.'s LR 56.1(a) Stmt. of Facts ("SOF") ¶ 1, ECF No. 133. Med-Care was a Florida corporation with its principal place of business in Boca Raton, Florida. Def. Silverman's LR 56.1(a) Stmt. of Facts ("SOF") ¶ 2, ECF No. 131.[2] Steven Silverman was Med-Care's president. *Id.* ¶ 21.

On six dates in July and October 2013, Arwa received nearly identical faxes from Med-Care. Pl.'s SOF ¶ 11. At the top of the faxes was either a header or a logo indicating that Med-Care was an approved "competitive bidding supplier" under the federal Medicare program.[3] *Id.* ¶¶ 12–13; Pl.'s Ex. H, Med-Care Faxes, ECF No. 133-8. Then, each fax contained the following statement:

> Your patient has asked us to contact you regarding authorization for a Nebulizer and its medications to help with their breathing problems. Your help in this matter is greatly appreciated by your patient and us. <u>Please review the prescriptions to sections 1, 2 & 3 before signing</u>. In order to supply these products to your patient, under the Medicare program, we must obtain a signed order by the patient's physician. Kindly sign and fax this form to our TOLL FREE FAX # above. Your cooperation will be greatly appreciated. THANK YOU!

---

[1]  The following facts are undisputed or have been deemed admitted, unless otherwise noted.

[2]  Med-Care is no longer in business and has commenced a proceeding for assignment for the benefit of creditors. Def. Silverman's LR 56.1(b) Resp. ¶ 2, ECF No. 139.

[3]  In July 2013, Medicare instituted the "Durable Medical Equipment Competitive Bidding Program," which reset the prices Medicare would pay for durable medical equipment based on competitive bids from suppliers. Under the program, only those suppliers whose bids were accepted could supply durable medical equipment to Medicare beneficiaries. *See* Def. Silverman's Ex. A, Kevin Goetz Dep. at 81, Ex. 11, ECF No. 131-1.

Pl.'s Ex. H, Med-Care Faxes. Section 1 of the ensuing form was pre-filled with a prescription for the drug Ipratropium-Albuterol and a "Nebulizer Kit." *Id.* Section 2 provided diagnosis codes: "493.90 Bronch Asthma," "492.8 Emphysema," "496 C.O.P.D.," or "Other." *Id.* Section 3 required a physician's signature and date. *Id.*

The faxes were each addressed to Murtaza Hameed, the owner and president of Arwa. *Id.*; *see* Pl.'s Ex. M, Hameed Decl. ¶ 1, ECF No. 133-13. Each fax contained the name of the same patient, but the person listed was not a patient of Arwa's or Dr. Hameed's. *See* Def. Silverman's SOF ¶¶ 9–14.

The faxes Arwa received were not unique. In fact, Med-Care used a third-party faxing service, WestFax, to send out similar prescription request forms "by fax and in bulk." Pl.'s SOF ¶¶ 16–18. Under this arrangement, Med-Care provided WestFax with blank templates for its prescription request forms, along with spreadsheets of contact information with which to fill in the forms. *Id.* ¶ 17. WestFax then "sent Med-Care's faxes for its nebulizer kits and medications in batches of 6,000 to more than 11,000." *Id.* ¶ 18. The six prescription request forms Arwa received were each part of a larger fax broadcast, in which each fax differed only by the patient and doctor identifying information. Pl.'s SOF ¶¶ 34–35. The six batches sent in July and October 2013 resulted in the successful transmission of 46,051 faxes. *Id.*

Silverman has said that Med-Care's business model as a mail-order medical equipment company involved reaching out to physicians to request prescriptions after first being contacted by patients needing medical products. Def. Silverman's SOF ¶¶ 6–8. For example, in this case, a customer contacted Med-Care through an online

3

portal. *Id.* ¶ 9. Med-Care contacted the patient and then sent a prescription request to Dr. Hameed via fax. *Id.* ¶¶ 6–7, 14. Silverman contends that Med-Care's faxes to Arwa were the result of the customer's mistaken belief that Dr. Hameed was her son's doctor. *Id.* ¶¶ 12–14.[4] Further, the fact that the faxes were part of a large broadcast was not unusual, he says, because "it was an ordinary practice to group prescription requests together for . . . specific product[s]." Def. Silverman's LR 56.1(b) Resp. ¶ 18.

Despite his knowledge of this process, Silverman declares that he had no personal control over the faxing operations of Med-Care. "As president," he says, "the day to day operations of the business were delegated to others" while he "focused more on big picture business development and the overall health of the business." Def. Silverman's SOF ¶ 21. Silverman did not send any faxes on behalf of Med-Care, did not oversee, supervise, or participate in sending faxes, and did not design or draft any of the prescription request forms. *Id.* ¶¶ 22–28. He did not execute Med-Care's contract with WestFax, nor did he have any involvement with uploading fax order requests to WestFax. *Id.* ¶¶ 30–31. Rather, John Porush (Med-Care's marketing director) signed the contract with WestFax on behalf of Med-Care, and Kevin Goetz (who oversaw Med-Care's operations) was responsible for uploading faxes to WestFax between January 2012 and December 2014. *Id.* ¶¶ 19–20; Def. Silverman's Ex. A, Kevin Goetz Dep. at 5, 11, 101, 152.

---

[4] Arwa disputes this fact, arguing that Silverman has not submitted any admissible evidence proving the contents of Med-Care's communications with the customer. *See* Pl.'s LR 56.1(b) Resp. ¶¶ 10–14, ECF No. 140.

4

Based on the six faxes it received and the evidence that the same faxes were sent to other physicians around the country, Arwa filed suit against Med-Care and Silverman on behalf of a putative class of fax recipients. Arwa claims that the defendants' faxing practices constituted common-law conversion and violated the TCPA, 47 U.S.C. § 227, and the ICFA, 815 Ill. Comp. Stat. § 505/1 *et seq.* In September 2017, the Court granted Arwa's motion to certify the following class:

> All persons who were sent one or more facsimiles from Med-Care Diabetic & Medical Supplies of Boca Raton, FL on any of the following 6 dates: July 2, 2013, July 10, 2013, October 2, 2013, October 9, 2013, October 17, 2013, or October 25, 2013, stating, "Your patient has asked us to contact you regarding authorization for a Nebulizer and its medications to help with their breathing problems. . . . In order to supply those products to your patient, under the Medicare program, we must obtain a signed order by the patient's physician."

*Arwa Chiropractic, P.C. v. Med-Care Diabetic & Med. Supplies, Inc.*, 322 F.R.D. 458, 470 (N.D. Ill. 2017).

Previously, the Court has entered a default judgment in favor of Arwa and against Med-Care as to liability; the issue of damages against Med-Care remains. Order of 3/20/18, ECF No. 137. Arwa now seeks summary judgment against Silverman on behalf of the class as to its TCPA claim, while Silverman asks the Court to enter summary judgment in his favor as to all claims.

## **Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Shell v. Smith*, 789 F.3d 715, 717 (7th Cir. 2015). To survive summary judgment, the nonmoving party must "do more

5

than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012). The evidence considered for summary judgment "must be admissible if offered at trial, except that affidavits, depositions, and other written forms of testimony can substitute for live testimony." *Malin v. Hospira, Inc.*, 762 F.3d 552, 554–55 (7th Cir. 2014). The Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013).

Moreover, Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Zander v. Orlich*, 907 F.3d 956, 959 (7th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The moving party has the initial burden of establishing that there is no genuine issue of material fact. *See Celotex,* 477 U.S. at 322. Once the moving party has sufficiently demonstrated the absence of a genuine issue of material fact, the nonmoving party must then set forth specific facts showing there are disputed material facts that must be decided at trial. *See id.* at 321–22.

## Analysis

I.  **TCPA Claim (Count I)**

Arwa contends that the six faxes sent between July and October 2013 violated the TCPA, which prohibits the sending of "unsolicited advertisement[s]" via fax. 47 U.S.C. § 227(b)(1)(C). Silverman responds that he should not be held liable under § 227(b)(1)(C) for two reasons: first, the faxes do not qualify as "advertisements," and second, he was not directly involved in the sending of the faxes.

A.  **Definition of "Advertisements"**

The TCPA defines an "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5); *see Holtzman v. Turza*, 728 F.3d 682, 685 (7th Cir. 2013). A fax may be an advertisement "even if the vast majority of its content has nothing to do with promoting a service's availability or quality." *Mussat v. Enclarity, Inc.*, No. 16-CV-07643, 2018 WL 1156200, at *3 (N.D. Ill. Mar. 5, 2018) (citation omitted); *see Holtzman*, 728 F.3d at 687. Also, a fax "need not explicitly mention a commercially available product or service, or express an intent by the defendant to market its products or services[,] if the fax [is] a 'pretext' to marketing the defendant's goods and services." *Mussat*, 2018 WL 1156200, at *3; *see Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 883 F.3d 459, 467–68 (4th Cir. 2018), *cert. granted sub. nom, PDR Network, LLC v. Carlton & Harris*

7

*Chiropractic* (U.S. Nov. 13, 2018) (No. 17-1705); *Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharm., Inc.*, 847 F.3d 92, 95–97 (2d Cir. 2017).

Silverman argues that Med-Care's faxes were not "advertisements" under this definition because they were merely requests to physicians to complete orders already placed by patients. In other words, as he sees it, the faxes do not "advertise" the "commercial" availability of any good or service, because they do not ask the recipients to purchase any goods or services. Arwa rejects this characterization, pointing out that the faxes clearly show the availability of a product (a nebulizer) and identify Med-Care as a "competitive bid supplier" of medical equipment.

The Court agrees that the faxes, on their face, do not contain advertising material. Rather, they provide a physician with information about his or her patient and ask the *physician* to perform a service—signing off on the prescription. What is more, although actual sales were taking place in the background of the faxes, the parties to the sales–Med-Care and its customers—had already finalized their agreement as to terms and pricing. In other words, the faxes did not seek to initiate new commercial transactions, but to complete a necessary condition of pending transactions.

The cases cited by Arwa do not require a contrary conclusion. Rather, in every case finding a fax to be an "advertisement," the fax solicited some type of future, prospective business transaction. *See, e.g., Lyngaas v. J. Reckner Assocs., Inc.*, No. 2:17-CV-12867-TGB, 2018 WL 3634309, at *3 (E.D. Mich. July 31, 2018) (fax sought to purchase services from recipients with an ultimate "profit as an aim"); *Able Home*

*Health, LLC v. Onsite Healthcare, Inc., S.C.*, No. 16-CV-8219, 2017 WL 2152429, at *2–3 (N.D. Ill. May 17, 2017) (fax informed recipients of the addition of a new physician who could provide new services); *AL & PO Corp. v. Med-Care Diabetic & Med. Supplies, Inc.*, No. 14 C 01893, 2014 WL 6999593, at *2–3 (N.D. Ill. Dec. 10, 2014) (fax described Defendant's products and solicited a marketing relationship); *Brodsky v. HumanaDental Ins. Co.*, No. 10 C 3233, 2014 WL 2780089, at *7–8 (N.D. Ill. June 12, 2014) (faxes described products available and contained a sales pitch).

True, the Med-Care faxes do indicate that a nebulizer is available for purchase. But that mere fact cannot itself create an "advertisement" when the fax does not seek to induce a future sale of that product. If so, absurdity would result. For instance, under Arwa's theory, a fax containing a receipt, a credit-card statement, or an invoice identifying the particular item purchased might constitute an "advertisement" and, thus, become subject to the requirements of the TCPA. "Congress' primary purpose in enacting the TCPA was to prevent the shifting of advertising costs to recipients of unsolicited fax advertisements." *Phillips Randolph Enters., LLC v. Adler-Weiner Research Chi., Inc.*, 526 F. Supp. 2d 851, 852 (N.D. Ill. 2007). The TCPA's definition of "advertisement" does not sweep so broadly as to cover any mention of an item, regardless of context.

The Eleventh Circuit has recently come to the same conclusion under nearly identical facts. In *Florence Endocrine Clinic, PLLC v. Arriva Medical, LLC*, 858 F.3d 1362 (11th Cir. 2017), the court considered unsolicited faxes sent to physicians by another mail-order medical supply company. The medical equipment in that case did

9

not require prescriptions, but the defendant nevertheless faxed the purchaser's physician an insurance reimbursement form, before sending the equipment to the purchaser. *Id.* at 1364–65. The Eleventh Circuit concluded that these faxes did not "promote the sale" of the defendant's goods because they "only request[ed] information to complete [orders] already made." *Id.* at 1367. "The clinic neither alleged that [Defendant] intended that the faxes induce the physicians at the clinic to prescribe [Defendant's] products to other patients . . . nor that the faxes request[ed] the doctors purchase the products." *Id.* Because the faxes merely requested information from the doctors, they had no advertising or commercial quality. *Id.*

Arwa attempts to distinguish *Florence*, noting that the customer in this case needed to obtain a *prescription* rather than an insurance reimbursement authorization. It points to a line in *Florence*, where the court distinguished cases that "involve[d] transmissions that encouraged the recipient of the fax to *prescribe* the drug to patients . . . ." *Id.* (emphasis added). But Arwa overstates the significance of this passage. The *Florence* court discussed one case that "explaine[d] in a different context that a communication intended to encourage a doctor to prescribe a drug to a patient would qualify as advertising." *Id.* That case, *Elan Pharmaceutical Research Corporation v. Employers Insurance of Wausau*, 144 F.3d 1372 (11th Cir. 1998), involved a pharmaceutical company's practice of advertising to doctors, who would then turn around and prescribe drugs to their patients. 144 F.3d at 1378 & n.11. In so doing, the *Florence* court distinguished between fax transmissions that sought to induce physicians to *initiate* drug sales to patients and transmissions that merely

10

sought authorization from physicians to *complete* ongoing sales. Because Med-Care's faxes fall within the latter scenario, the distinction between the prescription request in this case and the insurance reimbursement forms in *Florence* is immaterial.

The inclusion of the "competitive bid supplier" language on Med-Care's forms does not change this conclusion. Arwa is correct that even a small amount of material related to the sender's qualifications and services (*e.g.*, "name, address, logo, and specialties") may transform a fax into an advertisement. *See Holtzman*, 728 F.3d at 686–87; *see also Able Home Health*, 2017 WL 2152429, at *2 (discussing the significance of the inclusion of contact information and logos on a fax). But the ultimate question is still whether the fax advertises the availability of a commercial good or service for a future transaction. In *Holtzman*, the purpose of the fax—admittedly a "promotional device"—was sent to "plug[ ] the commercial availability of [Defendant's] services." 728 F.3d at 686–87. Similarly, in *Able Home Health*, the fax was sent to solicit new business. 2017 WL 2152429, at *2–3. Here, there is no evidence that the purpose of Med-Care's faxes was to drum up new sales. Silverman presented evidence that the "competitive bid supplier" language was included to assure physicians that Med-Care was legally authorized to supply medical equipment to their patients, rather than to solicit future sales. *See* Def. Silverman's SOF ¶¶ 15–18. Reading the fax in its entirety, the Court agrees, and Arwa's speculation to the contrary is not supported by evidence.[5] *See* Pl.'s SOF ¶¶ 12–15.

---

[5] Arwa points out that the "competitive bid supplier" language was not "required by any Medicare regulation." Pl.'s SOF ¶ 14. That may be so, but it does not compel the conclusion that the language was used as a marketing ploy.

11

Arwa's remaining arguments fare no better. Arwa points out that a fax need not solicit business from the recipient to be considered an "advertisement"; rather, a fax that seeks the recipient's assistance in contracting with a third party may still qualify. *See, e.g.*, *Comprehensive Health Care Sys. of the Palm Beaches, Inc. v. M3 USA Corp.*, 232 F. Supp. 3d 1239, 1242 (S.D. Fla. 2017) (concluding that a fax may violate the TCPA "if it ultimately leads to the promotion of goods or services"); *AL & PO Corp.*, 2014 WL 6999593, at *3 (explaining that a fax may be an advertisement even if the recipients are "not themselves direct purchasers" of the Defendant's goods but rather are intermediaries). But the Med-Care faxes do not "lead[ ] to the promotion of goods or services," *Comprehensive Health Care*, 232 F. Supp. 3d at 1242; rather, the sale of the nebulizer was already complete when Med-Care sent the faxes, conditioned only upon obtaining a valid prescription from the customer's physician. And, indeed, Arwa does not argue that Med-Care sold its products *through* physicians, but merely that the physicians' authorization was needed after the sales were agreed upon between Med-Care and its customers. *See also Robert Mauthe, M.D., P.C. v. Optum, Inc.*, Civ. A. No. 17-1643, 2018 WL 3609012, at *4 (E.D. Pa. July 27, 2018) ("Unless they promote the sale of an item by drawing public attention to it, faxes sent in furtherance of indirect commercial solicitations or transaction with third parties are not unsolicited advertisements.").

Finally, Arwa appears to suggest that Med-Care's faxes may have been a pretext for a larger advertising scheme. Courts, including this one, have recognized that faxes that do not directly solicit a commercial transaction, or even faxes that

12

offer free goods and services, may constitute "advertisements" if they are merely a "pretext" to marketing the defendant's goods and services. *Mussat*, 2018 WL 1156200, at *3; *see, e.g.*, *Carlton & Harris Chiropractic, Inc.*, 883 F.3d at 468 (concluding that fax could be an advertisement where it advertised a free e-book and it was "entirely plausible" that the e-book was distributed to "further [Defendant's own economic interests"). But other than vaguely citing to cases mentioning "pretext," Arwa does not develop this theory. Arwa makes no argument that Med-Care's faxes were fabrications or were anything other than legitimate prescription requests for purchases already completed, or that the faxes were actually intended to induce doctors to make future purchases. Accordingly, any such arguments are waived. *See Sommerfield v. City of Chi.*, 252 F.R.D. 407, 418–19 (N.D. Ill. 2008) ("[F]ailure to properly develop an argument with citation to relevant legal authority and to the record constitutes a forfeiture of the argument.").

### B. Personal Involvement of Defendant Silverman

Even if the Med-Care faxes *were* advertisements, however, Defendant Silverman could not be personally liable for them, unless he qualified as a "sender" under the TCPA. "In addition to the person who physically sends the fax, federal regulations bring within the definition of 'sender' 'the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement.'" *Heather McCombs, DPM, LLC v. Cayan LLC*, No. 15 C 10843, 2017 WL 1022013, at *5 (N.D. Ill. Mar. 16, 2017) (quoting 47 C.F.R. § 64.1200(f)(10)). Silverman seems not to fit within any of these

13

definitions, as the parties agree that (1) Silverman did not send any of the faxes, (2) the faxes were on behalf of Med-Care, not Silverman personally, and (3) if the faxes advertised anything, they advertised the goods and services of Med-Care, not Silverman.

That said, a corporate officer "may be personally liable under the TCPA if he had direct, personal participation in or personally authorized the conduct found to have violated the statute, and was not merely tangentially involved." *Physicians Healthsource, Inc. v. A-S Medication Sols. LLC*, 324 F. Supp. 3d 973, 983 (N.D. Ill. 2018) (quoting *Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 898 (W.D. Tex. 2001)); *accord A Custom Heating & Air Conditioning, Inc. v. Kabbage, Inc.*, No. 16 C 2513, 2017 WL 2619144, at *9 (N.D. Ill. June 16, 2017); *Chapman v. Wagener Equities, Inc.*, No. 09 C 07299, 2014 WL 540250, at *16–17 (N.D. Ill. Feb. 11, 2014). This rule is an exception to the general principle that "officers or employees are generally not liable for statutory violations based solely on their employment status," *A Custom Heating & Air Conditioning, Inc.*, 2017 WL 2619144, at *9.

Arwa insists that Silverman directly participated in or authorized the faxing operations of Med-Care. But the only evidence Arwa cites to support this theory is the fact that Silverman "knew" or "was aware" that Med-Care's procedures included sending faxed prescription requests to physicians. *See* Pl.'s SOF ¶¶ 40–42; Pl.'s LR 56.1(b)(3)(C) Stmt. Add'l Facts ¶¶ 12–14, ECF No. 140. But mere knowledge is not enough; "[d]irect participation or authorization" is required. *Physicians Healthsource, Inc.*, 324 F. Supp. 3d at 983. In fact, in all the cases cited by Arwa that

ascribed individual liability, the officers took some direct action in the fax campaign. *See, e.g., id.* (corporate officer told marketing agent what to write in the fax and approved its sending); *A Custom Heating & Air Conditioning*, 2017 WL 2619144, at *9 (plaintiff alleged that officer actively participated in the transmissions and directly benefited from them); *Mora v. Zeta Interactive Corp.*, No. 1:16-cv-00198, 2016 WL 3477222, at *3 (E.D. Cal. June 27, 2016) (plaintiff alleged officer was involved in design of fax and authorized payment for its transmission); *Chapman*, 2014 WL 540250, at *17 (plaintiff alleged officer directed a recipient list to be assembled, supervised the sending of the fax, created and approved the form of the ad, determined the frequency of transmissions, and paid for the ads); *Am. Blastfax, Inc.*, 164 F. Supp. 2d at 898 (officers were the "guiding spirits" and "central figures" behind TCPA violations).

In contrast, where there is a lack of evidence that a corporate officer personally participated in a faxing operation, courts have declined to impose personal liability. *See, e.g., Savanna Grp. v. Trynex, Inc.*, No. 10 C 7995, 2013 WL 4734004, at *8 (N.D. Ill. Sept. 3, 2013) (finding no personal liability where corporate officer merely signed a check and did not know what it was for); *Mais v. Gulf Coast Collection Bureau, Inc.*, No. 11-61936-CIV-SCOLA, 2013 WL 1283885, at *4 (S.D. Fla. Mar. 27, 2013) (concluding that there was "no evidence" that corporate officer had "anything personally to do with the calls made to Plaintiff"). This is the case here.

Arwa contends that Silverman still should be held liable because "the sending of the faxes was at the core of Med-Care's business," and Silverman must have

15

exercised direct authorization and control over it as the president of the company. *See* Pl.'s Resp. Def. Silverman's Mot. Summ. J. at 6, ECF No. 141. But this argument is merely a veiled attempt to impose vicarious liability on Silverman; it does not establish his "direct participation or authorization." *Physicians Healthsource, Inc.*, 324 F. Supp. 3d at 983. At most, it is speculation that is unsupported by the evidence and directly contradicted by the record.

Undeterred, Arwa points to the Seventh Circuit's decision in *FTC v. World Media Brokers*, 415 F.3d 758 (7th Cir. 2005), which concluded that "active participation in the corporate affairs" of a corporation could include merely "assuming duties as a corporate officer" to establish personal liability. 415 F.3d at 764. Under that standard, it seems, the mere occupation of a corporate office could be enough to hold Silverman liable. But *World Media Brokers* analyzed a corporate officer's duties under the Federal Trade Commission Act, not the TCPA. *Id.* The significant body of TCPA case law noted above developed after *World Media Brokers*, and, until the Seventh Circuit holds otherwise, the Court finds cases such as *Physicians Healthcare* and *Chapman* persuasive.

Arwa also suggests that Silverman should be held liable for failing to implement policies aimed at TCPA compliance. It cites to a line in *Mais*, 2013 WL 1283885, in which the Southern District of Florida indicated that personal liability for a corporate officer required proof that the officer "failed to take efforts to implement appropriate policies or procedures designed to comply with the TCPA, or that he authorized or personally engaged in conduct that clearly violated the TCPA."

16

*Id.* at *4. But, the court in that case did not cite to any case law or statute in support of its conclusion. Moreover, it appears to be commenting on the conduct of the corporate officer before it, who did "attempt[] to implement policies that conformed with the TCPA." *Id.* Accordingly, the Court finds Arwa's reliance on *Mais* misplaced.

As a final note, the Court acknowledges that the "direct participation or authorization" standard has recently been questioned by the Third Circuit, which suggested that officers should rarely be held liable under the TCPA if acting in their corporate, rather than personal, capacities. *See City Select Auto Sales Inc. v. David Randall Assocs., Inc.*, 885 F.3d 154, 159–161 (3d Cir. 2018). Under the Third Circuit's proposed analysis, Silverman could not be held personally liable unless there was some reason to pierce the corporate veil to find that the faxes "were really sent on behalf of" Silverman as opposed to Med-Care. *Id.* at 160. This heightened standard has yet to be applied in the Seventh Circuit (or the Third Circuit for that matter), but the analysis further supports requiring evidence of direct personal involvement before subjecting Silverman to liability under the TCPA.

For these reasons, the Court grants Silverman's motion for summary judgment as to Arwa's TCPA claim and denies Arwa's motion for partial summary judgment.

## II. Conversion (Count II)

Arwa's conversion claim seeks damages for the improper use of its "fax machines, toner and paper." Compl. ¶ 48, ECF No. 1. In opposing this claim, Silverman contends that Arwa has offered no evidence of any damages from its conversion, other than *de minimis* damages. Indeed, courts routinely treat claims of

17

conversion of toner and printer paper as "too trivial to support a cause of action." *Quality Mgmt. & Consulting Servs., Inc. v SAR Orland Food Inc.*, No. 11 CV 06791, 2012 WL 2128327, at *2 (N.D. Ill. June 11, 2012); *accord Old Town Pizza of Lombard, Inc. v. Corfu-Tasty Gyro's Inc.*, No. 11-cv-6959, 2012 WL 638765, at *2–3 (N.D. Ill. Feb. 23, 2012). Here, other than restating the allegations in its complaint with respect to conversion, Arwa points to no evidence that it suffered any damage more than minimal loss of ink and paper, or that Med-Care's use of its fax machine was a "violation of sufficient gravity" to support nominal damages. *See Quality Mgmt. & Consulting Servs., Inc.*, 2012 WL 2128327, at *3. In any event, the fact that Silverman had no responsibility for the faxes defeats this claim. *See Tahir v. Import Acquisition Motors, LLC*, No. 09 C 6471, 2010 WL 2836714, at *7 (N.D. Ill. July 15, 2010). Silverman's motion for summary judgment as to Arwa's conversion claim is accordingly granted.

### III. ICFA Claim (Count III)

Arwa also sought damages from Silverman for engaging in unfair business practices and unfair competition in violation of the ICFA, 815 Ill. Comp. Stat. § 505/1 *et seq*. In its response to Silverman's motion for summary judgment, however, Arwa states that it no longer wishes to pursue this claim. Accordingly, Silverman's motion for summary judgment as to this claim is granted.

## **Conclusion**

For the reasons stated herein, Silverman's motion for summary judgment [129] is granted, and Arwa's motion for summary judgment [132] is denied. A status hearing is set for 2/26/19 at 9:00 a.m. to discuss how Arwa wishes to proceed with its default judgment against Med-Care.

**IT IS SO ORDERED.**  ENTERED 2/11/19

_____
**John Z. Lee**
**United States District Judge**